S. LANE TUCKER
United States Attorney

JENNIFER IVERS
Assistant U.S. Attorney
KARLA PERRIN
Special Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: Jennifer.Ivers@usdoj.gov
Email: Perrin.Karla@epa.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PATRICK THOMAS FLEMING,<br><br>Defendant. | No. 3:22-cr-00046-JMK |

**UNITED STATES' SENTENCING MEMORANDUM**

The United States of America submits its Sentencing Memorandum for the imposition of sentence scheduled for February 10, 2023 at 10:00 a.m.

/ /

/ /

## SUMMARY OF SENTENCING RECOMMENDATIONS

**GUIDELINE RANGE........................................................ 10 - 16 months**

**TERM OF IMPRISONMENT............ 10 months (home confinement)**

**PROBATION.......................................................................... 5 years**

**SPECIAL ASSESSMENT ............................................................ $100.00**

**FINE ............................................................................ $66,000.00**

The United States Probation Office (USPO) has prepared a presentence investigation report (PSR) in this case at docket 27. The United States did not have any substantive objections to the PSR. Per the plea agreement (docket 20), the government agreed to recommend a sentence at the low-end of the Guideline range, and the defendant agreed to pay a $66,000 fine as a condition of supervised release. The plea agreement also provides that the parties agree United States Sentencing Guideline provision § 2Q1.2 applies. Defendant has since filed an objection to the PSR, requesting a 2-level downward departure pursuant to Application Note 5 of USSG 2Q1.2. As detailed below, the government disagrees with this request. The government recommends the Court sentence the defendant to 10 months of home confinement as a condition of three years of probation. The government agrees not to prosecute the defendant further for any other offense related to the event(s) that resulted in the charge(s) contained in the Information.

## I. REGULATORY & STATUTORY BACKGROUND

The Clean Air Act (CAA) is the comprehensive federal law that regulates air emissions from both stationary and mobile sources. One of the purposes of the CAA is "to

protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1); *see also* 42 U.S.C. § 7470. In enacting the CAA, Congress found that "the increasing use of motor vehicles . . . has resulted in mounting dangers to the public health and welfare." 42 U.S.C. § 7401(a)(2).

Diesel exhaust is a mix of acidic and hydrocarbon gases, such as nitrogen oxide and non-methane hydrocarbons, and particulate matter. See Keteles Memo, Exhibit 1. All of these pollutants have been well-documented to contribute to climate disturbance and ozone depletion and are directly harmful to human health. See 42 U.S.C. §§ 7412 and 7521(*l*); 72 Fed. Reg. 8428 (Feb. 26, 2007) (Control of Hazardous Air Pollutants from Mobile Sources; Final Rule). Exposure to diesel exhaust particulates has been linked to a variety of adverse health effects, including eye, nose, and throat irritation; bronchitis; immunological effects such as asthma and susceptibility to infection; lung inflammation; cardiovascular effects; and cancer.[1]

The CAA directs the United States Environmental Protection Agency (EPA) to issue regulations limiting the amount of pollutants that motor vehicles can emit. To meet these standards, diesel vehicle and engine manufacturers have developed a variety of emissions control equipment[2], including devices known as selective catalytic reduction systems

---

[1] EPA 2002; Riedl, M., D. Diaz-Sanchez. 2005. Biology of diesel exhaust effects on respiratory function. Journal of Allergy Clin Immunol. 221-228, available at https://www.jacionline.org/article/S0091-6749(04)03223-3/pdf (last visited Aug. 18, 2022).

[2] *Please see* Exhibit 2 for a glossary of terms referenced in this Sentencing Memorandum.

(SCRs), diesel particulate filters (DPFs), and exhaust gas recirculation systems (EGRs). Together, these hardware emissions control devices, along with others, make up a diesel vehicle's emission control system and are critical to ensuring that the vehicle complies with the CAA's emissions standards.

EPA regulations also require vehicle and engine manufacturers to install on their vehicles and engines monitoring devices known as on-board diagnostic systems (OBDs). The OBD is a computer-based system that monitors the operation of both the engine and emission control components. The OBD is composed of software and sensors that monitor emissions-related engine systems and components. The OBD system operates within a vehicle's electronic control module (ECM), which is essentially an on-board computer that receives inputs from various sensors and sends outputs through activators to control engine, vehicle, or equipment functions, including emission control components.

The diagram below shows the general layout of some of these components:



The OBD alerts the driver if any of the vehicle's emissions control equipment has malfunctioned in some way. When this occurs, the OBD will record a diagnostic trouble code (DTC) in the vehicle's computer and a malfunction indicator light (MIL) or "check engine light" will illuminate on the vehicle's dashboard. The MIL will remain illuminated until the malfunction is remedied. The MIL and DTC facilitate the detection and diagnosis of the malfunction, and the disabling of these functions serves to conceal the tampering of the emissions control system. With certain types of malfunctions, the OBD can force the vehicle's engine into "limp mode," which limits the maximum speed of the vehicle to as low as five miles per hour, incentivizing the driver to repair the malfunction.

Persons seeking to evade the CAA's pollution controls have developed methods of modifying or removing emissions control systems and making the OBDs inaccurate. These modifications are often marketed to diesel vehicle owners as improving the horsepower, torque, and reducing maintenance costs. However, these unlawful modifications result in a dramatic increase in multiple pollutants being emitted by each vehicle.

One way of disabling a manufacturer-installed emission control system is to remove the portion of the vehicle's exhaust system that contains the emission control equipment and replace it with a section of exhaust tubing known as "straight pipe" or "race pipe." The replacement pipes do not contain emissions control hardware. The act of removing or disabling a vehicle's emissions control system is often referred to as a "delete." A "delete" can increase particulate matter by a factor of approximately 40 times, nitrogen oxides by a

factor of approximately 310 times, carbon monoxide by a factor of approximately 120 times, and non-methane hydrocarbons by a factor of approximately 1,100 times.[3]




If a vehicle is deleted, the sensors within the deleted emission control components are also disconnected or removed entirely. A properly functioning OBD will detect the malfunction or removal of the emissions control equipment and, in certain instances, cause the vehicle to go into limp mode. Therefore, in order to prevent a diesel vehicle from detecting that the emissions controls have been removed or disabled, the OBD is typically modified by reprogramming it. The act of modifying the OBD in this way is often referred to as "tuning" or "flashing." This process essentially tricks the OBD, by either turning off

[3] "National Compliance Initiative: Stopping Aftermarket Defeat Devices for Vehicles and Engines, Environmental Protection Agency, https://www.epa.gov/enforcement/national-compliance-initiative-stopping-aftermarket-defeat-devices-vehicles-and-engines (last accessed June 22, 2022).

certain parameters or providing a false set of data for these parameters, preventing it from detecting the removal so that the vehicle can continue to operate.

## II. GENERAL FACTUAL BACKGROUND/OFFENSE CONDUCT

Arm Rippin Toys, Inc. (ART) was an Alaska corporation formed with the Alaska Secretary of State in March 2018. The company operated a vehicle repair shop in Anchorage, Alaska and specialized in services for diesel trucks. In 2019, defendant Patrick Fleming began working at ART and, by 2020, had become a partial owner of the company.

In addition to vehicle services, ART also sold equipment through its website. Items sold included equipment and devices used to defeat, remove, and replace air pollution control equipment on diesel vehicles. While employed at ART, Fleming was largely responsible for customer service as well as online sales and marketing.

Starting in at least July 2019, the Defendant and the other ART owners and employees entered an agreement to engage in "tuning and deleting" of customers' diesel vehicles. This process involved the removal of emissions control systems designed to reduce pollutants being emitted from the vehicles. Between approximately July 2019 and September 2020, the Defendant and others at ART or at the direction of ART, conspired to and did tune and delete *at least* 37 diesel vehicles[4] for its customers in violation of the CAA. ART charged its customers between $1,140 and $5,445 for the parts and labor to

[4] Based on the evidence obtained during the investigation, it is possible and indeed likely that ART tuned and/or deleted additional vehicles at its diesel repair shop. However, based on the review of available records, including invoices and email transactions, investigators with the Environmental Protection Agency's Criminal Investigation Division (EPA CID), were able to determine that ART engaged in this illegal conduct on a minimum of 37 vehicles.

remove emissions control systems and render inaccurate the vehicles' OBDs. In total, ART collected approximately $100,000 for performing unlawful deletes and tunes on diesel vehicles between about July 2019 and September 2020.

## II. GUIDELINE APPLICATIONS

### A. Offense Level

#### 1. Base level offense and enhancement

The government concurs with USPO's base offense level calculation of 8. U.S.S.G. §2Q1.2(a). The government likewise concurs with the six-level enhancement because the offense resulted in an ongoing continuous, or repetitive discharge, release, or emission of a hazardous or toxic substance into the environment. U.S.S.G. §2Q1.2(b)(1)(A).

Defendant has requested a 2-level downward departure pursuant to Application Note 5 of USSG 2Q1.2, which states:

> Subsection (b)(1) assumes a discharge or emission into the environment resulting in actual environmental contamination. A wide range of conduct, involving the handling of different quantities of materials with widely differing propensities, potentially is covered. Depending upon the harm resulting from the emission, release or discharge, the quantity and nature of the substance or pollutant, the duration of the offense and the risk associated with the violation, a departure of up to two levels in either direction from the offense levels prescribed in these specific offense characteristics may be appropriate.

As a threshold matter, the government has information indicating that the vast majority of the 37 identified vehicles tuned and deleted by ART are still operating. A Special Agent with EPA CID requested a law enforcement database search using the Vehicle Identification Numbers (VIN) for all 37 vehicles tuned and deleted by ART. The query found that 32 of the 37 vehicles remain registered in the state of Alaska as of today.

Further, due to the impracticality and expense of "undeleting" a vehicle, it is highly unlikely that emissions controls have on these vehicles have been restored. To do so would involve replacing all of the parts that had been previously removed from the vehicle – for most of these vehicles that would involve a new EGR, DPF, SCR, and DEF tank. Additionally, each piece of equipment has sensors which provide data to the OBD. When the equipment itself is removed, the sensor was also removed or, at a minimum, disconnected. Thus, to "undelete" a vehicle, the sensors would have to be replaced or restored. Finally, to ensure proper operation of the control equipment, the OBD would have to be re-tuned to its factory settings. This entire process with labor costs can be up to $10,000. Thus, the likelihood of these former ART customers "undeleting" their vehicles is quite low.

Regardless, of the 37 vehicles tuned and deleted by ART, five were visually observed or physically inspected between July 2020 and January 2021. Each of those vehicles remained modified, i.e., all of their emissions control equipment were missing. Based on records obtained during the investigation, those vehicles were inspected anywhere from 46 days to nearly one year after being tuned and deleted at ART. Thus, for *at least* that amount of time, those five vehicles had been emitting excess pollution as a result of Fleming's and ART's actions.

As detailed above, deleting even one diesel truck, causes 1,140 percent increase in the non-methane hydrocarbons being emitted from the truck; for nitrogen oxides (NOx) the increase is 310 percent. Indeed, over its lifespan, *each* deleted vehicle will emit more

than a ton of NOx and more than 18 pounds of particulate matter (PM). For those 37 vehicles alone, that equates to an additional 37 tons of NOx and more than one-quarter of a ton of PM being emitted from those deleted vehicles over their lifespan. See Exhibit 1, p. 1. And, of course, not included in this calculation are the significant number of vehicles for which ART sold equipment – across the country – allowing the customer to tune and delete their vehicles themselves.

The altering of 37 vehicles, which ran for any length of time, because of the very repetitive nature of driving a vehicle, justifies an enhancement for the offense resulting in ongoing, continuous or repetitive discharge of a hazardous or toxic substance into the environment. Indeed, courts have found that the full 6-level enhancement was applicable with much lower levels of contamination. For example, in *United States v. Bogas,* 920 F.2d 363 (6th Cir.1990), a case involving the improper burial of over 100 paint drums, the court analyzed note 5 to U.S.S.G. § 2Q1.2 and held that since there was visual contamination of the soil and some water contamination, the evidence supported a finding of actual environmental contamination. *Id.* at 368. Therefore, the court concluded, Bogas' sentence was correctly enhanced under subsection (b)(1).

In *United States v. Sellers*, 926 F.2d 410, 417-18 (5th Cir. 1991), the court found that the lower court did not err in refusing to make a two-level downward departure where *one* of sixteen drums of methylethylketone was leaking even though the drums were found just *one day* after being illegal dumped. The court concluded that the sentencing court "may have inferred actual environmental contamination from the leak, even for one day"

and that this factual finding was not clearly erroneous. Id. at 18. See also *United States v. Rubenstein*, 403 F.3d 93, 100 (2d Cir. 2005) (holding that there was sufficient evidence to support the six-level enhancement where the defendant illegally removed asbestos in violation of the Clean Air Act over two separate two-week periods).

Additionally, in *United States v. Goldfaden*, 959 F.2d 1324, 1331 (5th Cir. 1992), a case involving the discharge of hazardous waste to the sewer system in violation of the Clean Water Act, the court held that "subsection (b)(1) takes environmental contamination as a given, but allows for upward or downward departures depending on the potency, size, or duration of the contamination." Thus, the court held, "[t]he absence of proof of actual environmental contamination, in this case, therefore, does not affect the propriety of the district court's enhancement for repetitive discharges." Id. The increase in pollution in the instant case is much lengthier and extensive than that experienced in any of the above cases.

As such, defendant's claim that "there is no measurable contamination to ambient air quality", Dkt. 27, p. 18, is simply inaccurate. Indeed, as part of the factual basis for his plea agreement, defendant agreed that:

> Diesel exhaust is known to contain a variety of air pollutants, such as particulate matter (PM), nitrogen oxides (NOx), carbon monoxide (CO) and non-methane hydrocarbons (NMHC), as well as substances identified as hazardous air pollutants under the Clean Air Act: Ethylbenzene, Formaldehyde, n-Hexane, Lead Components, Manganese Compounds, and Mercury Compounds. The act of removing or disabling a vehicle's emissions control system can increase PM by a factor of approximately 40 times, NOx by a factor of approximately 310 times, CO by a factor of approximately 120 times, and NMHC by a factor of approximately 1,100 times.

Dkt. 20, p. 5-6. Based on this admission, it is unclear how the defendant can now argue that there exists no measurable contamination of air quality – simply because the air pollutants cannot be seen, as with an oil spill or soil contamination, does not mean they do not exist. As stated above, the tuning and deleting of the 37 vehicles at ART alone will necessarily cause an increase in pollution of 37 tons of NOx and one-quarter of a ton of particulate matter in and around the Anchorage area during the lifespan of those vehicles. This is undeniably environmental contamination.

Additionally, the defendant claims that "[t]he emissions involved in this case are certainly at the less serious end of the scope of emissions (both in quantity and dangerousness) covered under this guideline." Dkt. 27, p. 18. To the contrary, the pollutants being emitted by these vehicles, particularly the particulate matter contains a host of hazardous air pollutants, e.g., lead, mercury, and ethylbenzene, which cause a wide range of illnesses – both long and short term – including asthma, bronchitis, heart-related issues, and cancer. Indeed, there is a link between exposure to diesel particulates and increased hospital visits, absences from work and school, and even death. Those who are impacted the most are obviously those who live closest to heavily-trafficked roads, which often includes low income and communities of color. See Exhibit 1, p. 1-3.

That is especially true in Anchorage. The following map, obtained from EPA's EJScreen tool,[5] shows that many neighborhoods in Anchorage are exposed to the highest levels of diesel particulate matter in the state:

[5] Available at https://www.epa.gov/ejscreen.




Exposure to diesel particulates directly correlates with air pollutant-related cancer risk for residents of Anchorage, especially in low-income areas like Mountain View:




And as with many pollution events, the contamination here was not a discrete one-time occurrence. Rather, the increase in pollution will continue for years to come. These charts demonstrate the ongoing harm, especially to low-income communities, caused by Fleming's conduct.

Lastly, defendant stated that "many older vehicles on the road are not even subject to the emission controls at issue in this case." Dkt. 27, p. 18. While accurate – the emissions controls on the vehicles involved in the instant case were phased in and required on all such vehicles as of model year 2008 – the very statement misses the point. As identified in the toxicology report prepared by Dr. Kristen Keteles, Exhibit 1:

> A study that assessed benefits of vehicle emission reductions in the United States between 2008 and 2017 found that deaths from exposure to vehicle related PM2.5 dropped from 27,700 in 2008 to 19,800 in 2017 (Choma et al. 2021). The researchers concluded that deaths from exposure to traffic-related PM2.5 would have been 2.4 times higher in 2017 if vehicles were still emitting at 2008 levels, demonstrating that emissions controls result in decreased mortality.

Exhibit 1, p. 3. And, yet, by removing the emissions controls from the trucks identified in the instant case, the defendant and ART essentially re-wound the clock on to pre-2008, when pollution levels from vehicles resulted in 2.4 times greater deaths.

Based on the above, there is ample legal authority and factual support for the full 6-level enhancement for an ongoing continuous, or repetitive discharge, release, or emission of a hazardous or toxic substance into the environment. U.S.S.G. §2Q1.2(b)(1)(A).

**2. Criminal History Category**

In the Final PSR, the USPO has calculated the defendant's criminal history to be a category I. The United States agrees with this calculation.

**B. Acceptance of Responsibility**

The defendant has demonstrated acceptance of responsibility and U.S.S.G. §3E1.1(a) allows for a two-level decrease of the offense level. Due to an adjusted offense level of 14, the defendant is not eligible for the additional one-level reduction. U.S.S.G. §3E1.1(b).

//

//

//

//

## C. Total Offense Level

Given the above, the Government's proposed guideline calculation is as follows:

| Guideline | Adjustment |
|---|---|
| Base Offense Level. USSG § 2Q1.2(a) | 8 |
| Offense resulted in the on-going, continuous, or repetitive release of a hazardous substance. USSG §2Q1.2(b)(1)(A) | +6 |
| Acceptance of Responsibility. USSG § 3E1.1 | -2 |
| **TOTAL OFFENSE LEVEL** | 12 |

With a criminal history category I, the defendant's Guideline range is 10 to 16 months, in Zone C of the Guidelines, with a maximum sentence of five years of imprisonment for Count 1 of the Information.

## D. Fine

As part of the plea agreement, the defendant has agreed to pay a fine of $66,000. Although this is outside the guideline range, the government believes the offense conduct warrants this amount to disgorge the defendant of the financial benefit he received from his illegal conduct. Further, the amount is well below the maximum fine amount of $250,000 permitted by statute.

## E. Restitution

There are not identifiable victim(s) in this case, and restitution is not sought.

# V. APPLICATION OF 18 U.S.C. § 3553(a)

The crime itself and the history of the defendant are facts the Court must consider when fashioning an appropriate sentence. An application of the factors set forth in 18 U.S.C.

§ 3553(a) supports the government's recommended sentence.

**a. The nature and circumstances of the offense**

In March 2012, the State of Alaska suspended the motor vehicle inspection and maintenance program for control of carbon monoxide in Anchorage.[6] Despite the non-existence of a state maintenance program, federal law imposes emissions standards for diesel vehicles. The defendant was aware of the federal laws and regulations yet disregarded them. Further, despite knowing the vehicles ART was tuning and deleting were being used on area roads and highways, ART made efforts to push liability on the end users by creating an Off-Road Use Only Disclaimer.[7] This Disclaimer was published on ART's website and on the company's invoices.

The demand for aftermarket defeat devices is sometimes said to be driven by a desire for more power and torque, reduced maintenance costs, and avoiding potential downtime for control device regeneration or failure. The defendant and others at ART flouted CAA regulations by advertising these "benefits" for the business' gain. Regardless of the reasons, the defendant conspired with the other owners to circumvent EPA standards designed to

---

[6] State of Alaska, Department of Approval and Promulgation of State Implementation Plans: Alaska, 77 (to be codified at 40 C.F.R. pt. 52). Fed. Reg. Vol 77, No. 6, available at https://dec.alaska.gov/air/anpms/vehicle-emissions/news/ (last visited Aug. 18, 2022).

[7] There is a misunderstood belief within the diesel community, based on the definition of "motor vehicle" under the Clean Air Act, that tuning and deleting are permitted as long as the vehicle is being used for off-road or competition use only. *See* 42 U.S.C. § 7550(1) (definition of "motor vehicle" includes "any self-propelled vehicle *designed for* transporting persons or property on a street or highway") (emphasis added). While the premise of this belief is inaccurate (because the vehicles they are tuning were all *designed for* street use), the disclaimers, as used by ART, are often used as an attempt to deflect responsibility all while tuning and deleting vehicles that the individuals know are being used for on-road use.

keep the general public safe. As a result, the defendant's actions caused a dramatic increase in hazardous and other air pollutants being emitted from trucks in and around our community as these vehicles continue to pollute the air Alaskans breathe on a regular basis.

**b. The history and characteristics of the defendant**

The defendant will appear before the Court as a 30-year-old man with no relevant criminal history. (PSR ¶ 22-25.)

**c. The seriousness of the offense**

The environmental regulatory system that has been adopted in the United States is, in large part, a self-policing one. EPA inspectors and investigators exist in much smaller numbers than in traditional law enforcement agencies and cannot be omnipresent. Thus, they rely upon the regulated community to follow the law, as established by Congress.

The defendant was one of the owners who oversaw and facilitated the tampering and removal of at least 37 vehicles' emissions controls in the ART shop. He provided customer service for the company and often advertised their products and services online and through social media. The removal and tampering caused these vehicles to emit hundreds to thousands of times more pollution than it otherwise would, in the air in and around Anchorage. As previously cited, these pollutants contribute to a variety of public health problems, such as premature death in people with heart or lung disease, heart attacks, asthma, and other respiratory issues.

It is important for this Court to fashion a sentence that not only reflects the serious nature of the environmental offenses, but also ensures that others committing similar

offenses are deterred. These regulations are designed to keep the community safe, and the defendant and the larger regulated community must fully understand that there can be no gain or financial benefit to skirting the law.

**d. The need to provide just punishment for the offense**

The defendant has never served any time in custody. In this matter, the Court must balance the defendant's age and lack of criminal history, with the serious nature of the offense to which he has pled guilty. For these reasons, the government believes a sentence at the low-end of the guideline range is appropriate.

**e. To avoid unwarranted sentencing disparities**

To date, there are very few defendants who have been sentenced for this type of offense, particularly with respect to diesel vehicles. It is only in recent years that EPA began investigating such crimes and while multiple individuals have pleaded guilty to Conspiracy to Violate the Clean Air Act and Clean Air Act Tampering, to date, only a few have been sentenced. Recently, two of the defendant's co-conspirators were sentenced within the District of Alaska. Michael Hanzuk received a five-year term of probation, six-months home confinement, 180 hours of community service, and a $66,000 fine. *United States v. Hanzuk*, 3:22-cr-009 (D. Alaska 2022). Zachary Czubak was sentenced to a five-year term of probation, 180 hours of community service, and a $66,000 fine. *United States v. Czubak*, 3:22-cr-008-001. Czubak had been the last of the three former owners to join the company and thus had been engaged in the tuning and delete work for the shortest amount of time. By contrast, Hanzuk started ART after which Defendant Fleming joined a year later and

then Czubak. The *Hanzuk* and *Czubak* sentencings, stemming from the same factual circumstances, are obviously the most similar to the instant matter.

Additionally, in *United States v. Geouge*, 1:21-cr-96 (D.N.C. 2022), the defendant was sentenced to a term of one year and one day of incarceration for the same offense charged in the instant case – conspiracy to violate the Clean Air Act, 18 U.S.C. § 371 – after he sold over 14,000 tuning devices intended to defeat monitoring and emissions control systems on diesel vehicles.[8] Geouge was also required to pay a civil fine of $1.2 million to the EPA for selling such devices. Three additional defendants also pleaded guilty to the same offense for their roles in the scheme. Each of those three defendants were sentenced to six months of home confinement, a fine between $10,000 and $150,000, and between 80 and 100 hours of community service. See *United States v. Bailly, et al.*, 1:21-cr-75, 76, 77 (D.N.C. 2022).

An additional defendant was also recently sentenced for similar conduct, although the number of vehicles identified was dramatically lower than those in the instant matter. In *Love*, the defendant was sentenced to one year of probation and ordered to pay a $10,000 fine. *United States v. Love*, CR-21-264 (W.D. Ok. 2021).

Further, in *United States v. Gavin Rexer, et al.*, Nos. 4:20-CR-00230, 4:18-CR-00174, 00267 (M.D. Pa.), five individual defendants pleaded guilty to conspiring to defraud the United States and for violating the Clean Air Act (18 U.S.C. § 371) for their role in

---

[8] The defendant in that case had also pleaded guilty to tax evasion, 26 U.S.C. § 7201, and received the same sentence for the tax offense, to be served concurrently. He was ordered to pay more than $1.2 million in restitution to the IRS for this offense.

tuning and deleting a fleet of vehicles owned by Rockwater Northeast, LLC. The emissions control equipment on the vehicles was hollowed out, rather than removed, in an effort to conceal their actions, allowing the vehicles to pass visual inspections required in Pennsylvania. Each of the defendants was sentenced to a one-year term of probation; three of the defendants were also ordered to perform 50 hours each of community service. And the defendants were each ordered to pay a fine between $10,000 and $15,000. The violations for the company itself resulted in a multi-million-dollar settlement resolution.

Lastly, there are other similarly situated defendants who were sentenced for other Clean Air Act offenses in recent years within the District of Alaska. In *United States v. Hampton*, 3:14-cr-00068 (D. Alaska 2014), and *United States v. Morales*, 3:14-cr-00067 (D. Alaska 2014), the defendants each pleaded guilty to the offense of False Statements under the Clean Air Act, 42 U.S.C. § 7413(c)(2)(A). The defendants had each been employed at Westward Seafoods, Inc. in Dutch Harbor. Each of the defendants had responsibility for the proper operation of the power plant, including the emissions controls systems required under the facility's Clean Air Act permit to reduce the pollution being emitted from the large diesel engines. Instead of properly maintaining the control equipment, the defendants turned off those systems and reported false information on reports, ultimately submitted to the EPA, to make it appear as if those systems were running as required. For their respective roles in this offense, Hampton received a sentence of 70 days incarceration and Morales received a sentence of 45 days incarceration. An additional defendant, Bryan Beigh, was sentenced to a three-year term of probation for Clean Air Act Tampering, 42 U.S.C. § 7413(c)(2)(C), for

modifying a monitoring device required by the facility's permit, to make it appear as if the emissions control system was operating when it was not. *See United Stated v. Beigh*, 3:14-cr-00068 (D. Alaska 2014).

## VI. CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court sentence the defendant in accordance with the recommendations set forth in the plea agreement, which satisfy the goals of the U.S.S.G. and 18 U.S.C. § 3553(a).

RESPECTFULLY SUBMITTED this 3rd day of February 2023, in Anchorage, Alaska.

S. LANE TUCKER
United States Attorney

s/ *Jennifer Ivers*
JENNIFER IVERS
Assistant U.S. Attorney
United States of America

s/ *Karla Gebel Perrin*
KARLA GEBEL PERRIN
Special Assistant U.S. Attorney
United States of America

**CERTIFICATE OF SERVICE**
I hereby certify that on February 3, 2023,
a true and correct copy of the foregoing was
served electronically on the following:

Gretchen Staft, Esq.
Attorney for Patrick Fleming

s/ *Jennifer Ivers*
Office of the U.S. Attorney